In re **NATIONAL STUDENT MARKET-ING LITIGATION.**

**M.D.L. No. 105.**

United States District Court, District of Columbia.

June 25, 1974.

---

Julius Levy, New York City, for plaintiff class.

John Logan O'Donnell, New York City for defendant National Student Marketing Corp.

Lawrence J. Latto, Washington, D. C., for defendant Tate.

Theodore Sonde, Washington, D. C., for Securities and Exchange Commission.

## MEMORANDUM OPINION

PARKER, District Judge.

In this multidistrict litigation the Court is called upon to consider and to approve a Stipulation and Agreement of Compromise and Settlement between the class plaintiffs and one of the principal defendants, National Student Marketing Corporation (NSMC). Following a preliminary hearing [1] to which all parties were invited to participate, the Court entered an Order and Order to Show Cause and notice of the proposed settle-

ment was mailed to the class and present NSMC shareholders.[2] In addition, publication was ordered in The Wall Street Journal. The Order invited class members and present shareholders to submit in writing any objections to or their views on the fairness, reasonableness and adequacy of the settlement. A settlement hearing was held in open Court on June 14, 1974, and counsel for all parties were afforded a further opportunity to comment upon the terms of the agreement.

Prior to hearing the Court received only one objection from a shareholder class member, Mr. Robert P. Tate, a non-settling defendant in this proceeding. All but one of Tate's comments and objections were cosmetic in nature and were either abandoned after clarification by counsel for the settling parties or adopted by the Court through the accompanying Judgment. One remaining objection of this defendant is addressed and resolved, *infra*. The Court received a direct communication from the University of Chicago, a class member currently holding 50,000 shares of NSMC, urging approval of the settlement. During the hearing counsel for another major shareholder, Keystone Custodian Funds, represented that his client considered the agreement to be adequate. No other objections or comments from interested parties were offered.

Counsel for the class plaintiffs and NSMC submitted memoranda of points and authorities supporting approval of the proposed stipulation and agreement. These papers were accompanied by a report of Duff, Anderson and Clark, independent financial analysts retained by the settling parties to analyze and evaluate NSMC's financial posture with particular emphasis placed upon the eco-

---

1. The preliminary hearing was scheduled in accordance with the recommended procedure of the Manual for Complex Litigation, § 1.-46, to obtain the views of non-settling defendants as to the possible effect upon their clients.

2. Notification of present shareholders who might not be within the class as defined by the Court was necessary because derivative claims asserted on behalf of NSMC are affected by the terms of the settlement.

nomic feasibility and potential effect of the settlement.

## DESCRIPTION OF THE LITIGATION

Two private law suits form a significant portion of this consolidated multidistrict litigation.[3] Initially filed as three individual law suits in the United States District Court, S. D. New York (Garber v. Randell et al.; Lipsig et al. v. National Student Marketing Corporation et al.; Natale v. National Student Marketing et al.) and later transferred to this jurisdiction by the Judicial Panel on Multidistrict Litigation, these actions eventually were reduced to two separate complaints, Garber et al. v. Randell et al., C.A. 2405–72 and C.A. 2406–72 and Natale v. Randell et al., C.A. 2407–72.[4] By Orders dated October 2 and October 12, 1973 the suits were designated as class actions, the class to include all shareholders who purchased, exchanged or otherwise acquired common stock of NSMC between April 1, 1968 and February 17, 1972.[5]

The complaints are virtually identical. The central allegations in each are that during the class period NSMC perpetrated a wide scale securities fraud upon the investing public and business community by issuing, disseminating and promoting false and misleading financial information tending to inflate the company's economic stature. The vehicles for said fraudulent program included filings with the Securities and Exchange Commission, press releases, and proxy statements to shareholders.

Named as defendants in addition to NSMC are certain officers, directors, and employees of the company, its outside independent auditors, several officials of Interstate National Corporation (Interstate) which had been merged into NSMC, a Chicago law firm representing Interstate, and an attorney who represented another company which had been acquired by NSMC.

The complaints differ in two respects. The Natale proceeding alone asserts a claim against a New York law firm and one of its members, who served as NSMC's outside legal counsel, for alleged improper participation in the merger arrangements between NSMC and Interstate and the concealment of certain information obtained therein. The Natale claim also challenges the issuance by those attorneys of allegedly false and misleading opinions concerning the sale of two of NSMC's subsidiaries.

The Garber action contains a derivative claim brought on behalf of NSMC against other defendants for alleged breach of their fiduciary duties in connection with the asserted wrongdoing. The Natale complaint does not include a derivative cause of action.

## TERMS OF SETTLEMENT

The basic fairness of the settlement has not been questioned and it is therefore unnecessary to detail and analyze

---

3. Included also within this consolidated proceeding is an injunctive action initiated by the Securities and Exchange Commission against National Student Marketing and others, S.E.C. v. National Student Marketing Corporation et al., C.A. 225–72.

4. Chief Judge Edelstein of the United States District Court for the Southern District of New York ordered the filing of a consolidated complaint to encompass the claims of all three actions. A subsequent motion for severance by defendant White & Case, NSMC's former attorneys, was denied. On appeal, the Second Circuit affirmed the severance denial but reversed the order of consolidation. Thereafter general counsel for plaintiffs sought and was granted leave to file the present amended complaint in Natale and a second consolidated amended and supplemental complaint in Garber. The latter pleading incorporates the claims of the earlier Garber and Lipsig actions and therefore retains the docket numbers previously assigned to those cases.

5. The class includes purchasers in the open market, those who obtained stock through private placements, and "acquisitionees" who acquired stock in exchange for businesses sold to NSMC. An estimated 80% of the class still hold the stock.

each provision of the agreement. The settlement terminates only the class claims against NSMC. The claims against the other defendants, including the derivative claim, remain intact for further litigation. The agreement assures that the rights of the non-settling defendants will not be prejudiced.

At the heart of the agreement is the provision that in lieu of a cash settlement fund, NSMC issue 2,050,000 shares of treasury common stock from which class member claims will be distributed. Additionally, the company will assign any recovery under the derivative claims to the class.[6]

National Student Marketing will bear the costs of administering the agreement, including expenses incurred to determine, process and distribute the claims. Since the settlement is effectuated by a transfer of shares it was resolved by the bargaining parties that the class fund should not be burdened with these substantial administration expenses. Payment of litigation expenses, consisting principally of attorney and accountant fees and expenses incurred only in connection with the settlement, are chargeable to the settlement fund upon approval by the Court.

Counsel for NSMC issued, as required by the stipulation, an opinion that the transfer of the 2,050,000 shares from NSMC to the class does not require registration under the Securities Act of 1933, and that said stock may subsequently be transferred by a class member who is neither an affiliate of NSMC at the time of transfer nor an issuer, indemnitor or dealer as defined by the Act.[7]

The formula for the computation of claims—in particular the treatment accorded cash purchasers as opposed to acquisitionees—has been focused upon by Mr. Tate in his "substantive" objection. It is agreed that no category or group of class members shall receive preferential treatment or be discriminated against. However, concern has been raised that the terms of the stipulation as presently constructed contain ambiguities which might lead to problems in future assessment of shareholder claims.

The stipulation provides the following method of computation:

The damages of class members shall be computed as follows:

■(c)i. For damage claims of a Class Member with respect to NSMC shares purchased for cash during the class period: the amount paid to purchase such shares less $1.50 per share for each such share but as to any such shares sold during the class period, in no event shall the amount exceed his actual loss on any such sale.

ii. For damage claims of a Class Member who acquired his NSMC shares in exchange for other shares, property or other consideration, the value of said consideration less the sum of (a) amounts received by reason of sales of such NSMC shares made during the class period, (b) amounts received (other than NSMC stock) in connection with such exchange transactions, and (c) $1.50 times the number of NSMC shares received in such exchange and not sold during the class period.

Under these terms purchasers for cash and acquisitionees will receive equal treatment and the Court interprets the above provisions as comporting with that notion. The agreement provides that, as to both class members, amounts realized from sales of NSMC stock for any given transaction will be deducted from any claim of loss for such transaction.

---

6. With consent of counsel for the class, and upon Court approval, derivative recovery against a particular defendant may revert to NSMC.

7. The Securities and Exchange Commission has issued a no-action letter to the effect that NSMC may transfer the shares to the class without registration.

■ It is impossible to anticipate each and every potential problem which may arise in connection with the assessment of claims. In any event the Court stands as the final arbiter to determine the rights and benefits of all class participants. Paragraphs 6(c)i and 6(c)ii are accepted as submitted.

The agreement further provides that, subject to Court approval, certain class members, who are named defendants and participants in the fraud complained of, may not recover from the settlement fund since any such benefit would be inherently inequitable.

## EVALUATION OF THE SETTLEMENT

■ It is well established that the court assumes a limited role when requested to approve a class action settlement proposal. While the interests of the class members must be carefully protected, West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710, 740 (S.D.N.Y. 1970), aff'd. 440 F.2d 1079 (2d Cir. 1971), the Court must avoid deciding or trying to decide the likely outcome of a trial on the merits. Approval or disapproval is dependent upon whether, under all of the particular circumstances, the terms reached are fair, reasonable and adequate. Young v. Katz, 447 F.2d 431 (5th Cir. 1971); Lewis v. Newman, 59 F.R.D. 525 (S.D.N.Y.1973).

■ There is, of course, no magic formula by which the overall soundness of a settlement is judged. However, several considerations, often interrelated, have consistently been identified as valid guiding principles. City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974); *West Virginia, supra.* These factors include: complexity and nature of the litigation; potential costs of litigation; the stage of the proceedings when settlement has been offered and degree of completed discovery; likelihood of establishing requisite elements of liability and damages; class reaction to settlement; risks attendant to trial; and ability of defendant to absorb a larger recovery. The opinion and judgment of experienced counsel, whose labors produced the settlement, should also receive due consideration.

As to the relative merits of the claims and defenses, and the accompanying risks of trial, counsel for the class and NSMC, after considerable discovery,[8] have recognized the various obstacles with which they would necessarily be confronted should the claims be prosecuted through trial. Most of these problems flow from the complexities and difficulties inherently involved in shareholder securities fraud litigation. Judge Weinfeld, in approving the settlement in Lewis v. Newman, *supra,* observed:

> It must be recognized that stockholder litigation is notably difficult and notoriously uncertain. 59 F.R.D. at 528.

The issues in dispute are by no means simple and there are conceded problems in establishing both liability and damages under the fraud provisions of the federal securities laws.

NSMC, although aware of the possible weaknesses in plaintiffs' case, deems it imperative, for reasons more fully explained below, to end any further involvement in this litigation.

Discussion of the relative strength and weaknesses of the merits, however, borders on the academic in light of other controlling considerations.

It is unquestioned that the moving force behind the eagerness of the parties to settle, as well as the acceptance of the non-cash form of settlement, is the uncertain financial condition of NSMC. The company is heavily in debt and, to

---

8. Voluminous amounts of material have been reviewed including files and records of NSMC; work papers of NSMC's auditors and co-defendant Peat, Marwick, Mitchell & Co.; and transcripts and exhibits gathered by the SEC during its lengthy investigation of the company.

some extent due to the pendency of this litigation, lines of credit needed to maintain its operations are not easily established or are established on unfavorable terms.

From the company's standpoint the settlement has been termed an economic necessity, the approval of which will hopefully remove a major roadblock from its attempt at financial recovery. Plaintiffs, on the other hand, while seeking maximum recompense for alleged wrongs, are also cognizant that too large a recovery after trial might drive NSMC into bankruptcy, converting any fought for judgment into a mere Pyrrhic victory. It is the hope and reasoned opinion of counsel that by removing the cloud of these suits the company will be able to reestablish its position in the business community, secure more favorable credit,[9] improve its operations, salvage some of its severely damaged reputation and ultimately appreciate the legitimate worth of its stock and thereby maximize the value of the class settlement recovery.[10]

These are merely expectations and one cannot assume that NSMC's future is by any means certain. Experience has all too often taught the unpredictable nature of any given business situation, especially within the volatile confines of the stock market. It is fairly certain, however, that NSMC cannot continue to function under the present conditions.

■ Settlement at this juncture, under the provisions bargained for at arms length by counsel, appears to be mutually advantageous. Indeed, all indications are that settlement for stock is the wisest, if not the only, course available to plaintiffs. By not pressing for cash, and by avoiding further costly litigation expenses, which might only result in an uncollectible judgment, the company should be in a posture to redirect its attention and resources from defending this suit to attempting to regain its financial footing.

It is also significant that approximately 80 per cent of the class, which includes ' professional money managers and acquisitionees with considerable holdings,[11] still retain their shares and have voiced no opposition, in apparent approval of or acquiescence in the agreement.[12]

The settlement is approved.

---

9. NSMC has received indications from at least one banking institution that additional credit may be arranged, after settlement, on terms previously unavailable because of this litigation.

10. The stock is presently valued at approximately ⅝ a share. Duff, Anderson and Clark predict that the value after settlement might increase appreciably.

The amount of shares to be transferred, 2,050,000, was reached after arms length bargaining with both sides recognizing the danger and ramifications of an excessive depletion of the company's equity.

Payment of stock has been recognized as an appropriate means of settlement. Hertz v. Canrad Precision Industries, Inc., CCH Fed.Sec.L.Rep. ¶ 94,112 (S.D.N.Y.1973).

11. It is estimated that acquisitionees hold about 40 per cent of the number of shares in the class. These class members have entered into letter agreements with NSMC to the effect that they have elected to remain within the class and participate in settlement. Any potential claims against the company, including rescission, have been waived.

12. "The strong support for the proposed compromise is a factor of great weight." State of West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710, 743 (S.D.N.Y.1970).