Burke C. PRAY & Eleanor S. Dodson, Administrators of the Estate of Jo-An K. Pray, Deceased, and on behalf of all others similarly situated, and Friends for all Children, Inc., Special Administrator of the Estate of Tran Thi Ba and Seventy-Five other decedents, Plaintiffs,

v.

LOCKHEED AIRCRAFT CORPORATION,
Defendant.

FRIENDS FOR ALL CHILDREN, INC., Special Administrator and legal and personal representative of the estate of Giang Thi Ngoc Diep (Powell), et al., Plaintiffs,

v.

LOCKHEED AIRCRAFT CORPORATION,
Defendant.

FRIENDS FOR ALL CHILDREN, INC., Special Administrator and legal and personal representative of the estate of Nguyen Kim Hoa (Selzer), et al., Plaintiffs,

v.

LOCKHEED AIRCRAFT CORPORATION,
Defendant.

Civ. A. Nos. 75–0874, 86–0190 and 86–0191.
Suffix Nos. 75–0874–1, 75–0874–2.

United States District Court, District of Columbia.

Aug. 22, 1986.
On Motion for Reconsideration Sept. 10, 1986.

J. Vernon Patrick, Jr., J. Vernon Patrick, Jr. & Associates, P.C., Birmingham, Ala.,

Oren R. Lewis, Jr., Lewis, Wilson, Lewis & Jones, Ltd., Arlington, Va., Jacob A. Stein, Stein, Mitchell & Mezines, Washington, D.C., for plaintiffs.

Carroll E. Dubuc, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

### The Settlement Agreement

On April 9, 1986, the parties to this litigation entered into a Settlement Agreement whereby defendant Lockheed Aircraft Corporation ("Lockheed") paid into the Court Registry the sum of $10,000,000 in purported settlement of all claims arising out of the crash of the Lockheed C–5A aircraft in Saigon in 1975. Settlement Agreement at ¶ 2 (filed under seal April 11, 1986, unsealed April 22, 1986). The terms and conditions of the Settlement Agreement are subject to approval by the Court after notice and hearing. *Id.* at ¶ 3. The Settlement Agreement further contemplates that the Court will adopt a distribution plan after considering the applications of all potential participants in the Settlement Fund. *Id.* at ¶ 7. The Settlement Agreement leaves the distribution of the Settlement Fund to the discretion of the Court with the understanding that any portion of the Settlement Fund not distributed will revert to Lockheed.

The contemplated hearing was held on August 4, 1986. No objection was raised to the amount or terms of the Settlement Agreement. Moreover, the Court has independently reviewed the Settlement Agreement and finds it reasonable.

This is not a class action. Nevertheless, it is analogous in that it settles numerous similar claims of similarly-situated plaintiffs. Accordingly, the factors relating to approval of class action settlements provide appropriate criteria for appraisal of this settlement. These factors include the complexity and nature of the litigation, the stage of proceedings when settlement was offered and the degree of completed discovery, the likelihood of plaintiffs' establishing the requisite elements of liability and damages, the plaintiffs' reaction to the settlement, the risks attendant to trial, and the ability of defendant to absorb a larger recovery. *Officers for Justice v. Civil Service Commission of the City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir.1982), *cert. denied*, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983); *In re National Student Marketing Litigation*, 68 F.R.D. 151, 155 (D.D.C.1974). In the ordinary class action setting, the court's primary purpose in reviewing a proposed settlement agreement is to protect the rights of absent class members who were not involved in the negotiations leading to settlement. *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 225 (5th Cir.1981). There is no need for "the court to act in a fiduciary role" to protect the defendant who negotiates a settlement. *Id.* Nevertheless, in light of the public context of this litigation, the recent concern about the "lawsuit crisis" and the effect of the litigation on defendants and their insurers, this review will address the fairness of the settlement as a whole, as it affects both parties and the public.

This litigation has been extraordinarily complex and prolonged. Civil Action No. 75–0874 was filed in 1975 in this Court by Friends For All Children, Inc. ("FFAC") as Special Administrator and assigned to then Chief Judge William B. Jones. The complaint sought compensatory and punitive damages from Lockheed for the estates and next-of-kin of 76 children who were in FFAC's custody and were killed in the April 4, 1975 crash of a C–5A aircraft, manufactured and designed by Lockheed. Thereafter, Lockheed filed a third-party complaint against the United States. On November 5, 1975, in *In re Air Crash Disaster Near Saigon, South Vietnam, on April 4, 1975*, 404 F.Supp. 478, the Judicial Panel on Multi-District Litigation transferred a number of other civil actions on behalf of a number of United States citizens who were killed and injured in the April 4, 1975 C–5A crash to Judge Jones for consol-

idated discovery and pretrial proceedings pursuant to 28 U.S.C. § 1407. The United States citizen plaintiffs were represented by a number of attorneys led by the firm of Cole and Groner appointed by Judge Jones. The firm of Lewis, Wilson, Lewis & Jones, Ltd. was counsel for FFAC as the legal representative of the surviving infants and the estates of the deceased.

In all of these cases there has been exhaustive discovery. Between 1975 and 1979 discovery focused on the liability and punitive damages issues. By 1979, most of the United States citizen cases were settled. In 1979, there was a stipulation in the survivors' cases brought by FFAC by which the survivors abandoned their punitive damages claim and defendant agreed not to contest its liability to anyone injured. From 1979 through 1984 almost all of the discovery and litigation related to the survivors' cases, specifically whether the crash injured the survivors and, if so, to what extent.

Before 1979, the decedents' cases were the subject of a number of appeals and mandamus proceedings before the United States Court of Appeals for the District of Columbia. By Order entered May 1, 1978, this Court ruled provisionally that District of Columbia law would govern the litigation, and that FFAC was qualified under District of Columbia law to bring this litigation as a "legal representative" of the 76 deceased children. By Order entered February 23, 1979, for reasons stated in a Memorandum filed April 12, 1979, this Court denied Lockheed's renewed motion for summary judgment, and appointed Charles R. Work, Esq., and his law firm as guardians *ad litem* for the interests of infant beneficiaries of the decedents' estates. On March 29, 1979, Lockheed filed a petition for writ of mandamus and sought, and on April 9, 1979, obtained, a stay of further proceedings. By Order entered August 7, 1979, however, the Court of Appeals denied Lockheed's petition for manda-

mus and vacated the April 9, 1979 stay order, but has never finally ruled on the merits of defendant's challenge to FFAC's standing as a plaintiff. Thereafter, attention focused on the survivors' cases and the decedents' claims lay dormant until the survivors' claims were resolved.

In 1982, after several trials of the cases brought on behalf of surviving plaintiffs adopted by United States parents, defendant paid in settlement $13,500,000 which yielded approximately $125,000 to each of 45 plaintiffs and, upon exhaustion of these and other family resources, an opportunity to draw funds from a trust originally funded with $2,250,000 for a serious medical emergency. In addition, seven individual cases were settled for amounts ranging from $125,000 to $1,000,000 for a total of $4,078,000. After two more trials the cases brought by 76 surviving plaintiffs who had been adopted by parents in foreign countries were settled in 1984 for $17,-800,000. This settlement yielded between $200,000 and $312,000 to each foreign plaintiff whose case had been tried or prepared for trial and $84,673 for each of the other plaintiffs plus access to the proceeds of a trust originally funded with $2,925,000 for supplementary medical and educational services.

For their services in the survivors' cases and the recovery of $31,300,000 for their clients, plaintiffs' counsel and guardians *ad litem* received approximately $11,780,000 in fees, and more than $4,111,000 as reimbursement for expenses incurred in the prosecution of the survivors' cases over the vigorous defenses mounted by Lockheed and the government. Decision on the fee and expense claims of counsel and the guardians *ad litem* in the survovors' cases required the services of Harry Huge, Esq., and Duane Vieth, Esq., as Special Masters.[1]

In 1984, after the survivors' cases were settled, discovery reopened in the decedents' cases. For example, 72 additional discovery depositions were taken (with

---

**1.** The Special Masters resolved the expense claims in the domestic survivors' cases without compensation. Mr. Huge was paid for his sub- sequent services in respect to the foreign survivors' fee problem. His fee of $103,000 was charged to counsel.

transcripts totaling more than 3,400 pages). On December 18, 1985, this Court entered judgment in favor of Lockheed with respect to the claims filed by FFAC on behalf of estates of 74 of the deceased children. An accompanying memorandum noted that information gathered by the guardians *ad litem* "reveals that of the 76 decedents only Giang Thi Ngoc Diep and Hguyen Kim Hoa have any natural relative in the United States." Memorandum at 4 (filed Dec. 18, 1985) ("December 18 Memorandum") (citing Report of the Guardian *Ad Litem* to be Filed Under Seal Pursuant to this Court's November 19, 1985 Order (filed Dec. 6, 1985)). Finding that there was no legal authority for prospective adoptive parents to inherit from a prospective adoptive child, the Court dismissed their claims. Plaintiffs' counsel then filed a notice of appeal to the United States Court of Appeals. This appeal on behalf of the 74 deceased infants with no known natural relatives was unresolved at the time that the present Settlement Agreement was reached.

At the same time that the Court dismissed the claims on behalf of the 74 deceased children without identified blood relatives, this Court denied Lockheed's renewed motion for summary judgment with respect to claims regarding the other two deceased children: one filed by FFAC and Willie A. Powell on behalf of the estate of Giang Thi Ngoc Diep, deceased; the other filed by FFAC and Terry Selzer as next friend of Nga Selzer on behalf of the estate of Nguyen Kim Hoa, deceased. The *Powell* case was scheduled for trial on April 2, 1986. On March 26, 1986, the Court dismissed Lockheed's third-party complaint against the United States because it more appropriately lies in the United States Claims Court. Order (filed March 26, 1986).

Meanwhile, on February 13, 1986, counsel filed a Joint Motion Requesting the Court to Direct the Parties to Confer with a Judge of this Court Designated as a Settlement Judge. The motion requested the designation of Judge Joyce Hens Green who had successfully presided over the settlement of the multiple claims arising out of the Air Florida crash, *In re Air Crash Disaster in Washington, D.C. on Jan. 13, 1982*, 559 F.Supp. 333 (D.D.C.1983), and had also participated importantly in the settlement of the phase of the Lockheed cases involving the foreign survivors. Counsel suggested that it would be inappropriate for the trial judge to become intimately involved with the offers and demands of the parties on the eve of trial and agreed to treat the settlement discussions confidentially. Judge Green graciously accepted the designation and met with counsel over several weeks. Although she proposed a settlement figure after hearing the views and proposals of the parties, her proposal was not agreed to in the time allotted for negotiation and the case reverted to the trial judge. Settlement negotiations continued as the trial date approached, and during the trial, without disclosure to the trial judge of any of the amounts proposed either by the parties or by Judge Green.

On April 2, 1986, following completion of discovery, a jury was selected to try the *Powell* case, and plaintiffs' counsel presented the testimony of several witnesses. On April 9, 1986, counsel interrupted plaintiff's affirmative case, completed their negotiations and executed the present Settlement Agreement, all with the active assistance of the trial court. The Agreement, filed on April 11, 1986, was intended to settle all of the decedents' cases for what the trial court now understands [2] an amount approaching, but less than, that proposed by Judge Green.

Obviously risks attend any trial and, because of the complexity of this one, it is not clear how the jury would have decided. Nevertheless, it was apparent that at the time the trial adjourned the jury appeared

---

**2.** This understanding was confirmed by counsel at the hearing on the Settlement Agreement held on August 4, 1986.

sympathetic to plaintiff Powell, and that plaintiffs' counsel were making good on their proffer of evidence to support the punitive damage claim. For example, according to the pretrial brief, to minimize cost, Lockheed had used an aluminum alloy instead of steel in the bellcrank which operated the door which failed in flight. The pretrial brief proffered, among other things, an outline of the testimony of Dr. Malcolm Newman. The brief identified Dr. Newman as an expert in mechanical engineering who had "served in a wide range of duties in academic university appointments and corporate consulting and management." Plaintiffs' Pretrial Brief at I–30 (filed Jan. 14, 1986). Dr. Newman was proffered to testify that the C–5A original design was a grossly defective scale-up of a smaller aircraft C–141, that the original designs of the lock systems of the door that failed and the routing of the hydraulic systems were "defective, negligent and extremely hazardous" and were "likely to fail," and that Lockheed was aware of these problems. *Id.* at I–30, I–32. Dr. Newman was the last witness to testify before the parties joined in a motion to continue the case in order to complete and consummate the settlement. Transcript of Proceedings (Tr.) 4/4 at 586–613 (filed April 30, 1986). Dr. Newman's testimony, as far as it went, was entirely consistent with the proffer of it in the Pretrial Brief.

In addition to evidence to rebut plaintiffs' evidence of liability and reckless conduct, Lockheed's pretrial briefs relied on the government contractor defense. *See Bynum v. FMC Corp.,* 770 F.2d 556 (5th Cir.1985); *In re Aircrash Disaster at Mannheim, Germany on 9/11/82,* 769 F.2d 115 (3d Cir.1985), *cert. denied, Schoenborn v. Boeing Company,* —— U.S. ——, 106 S.Ct. 851, 88 L.Ed.2d 891 (1986); *Tillett v. J.I. Case Co.,* 756 F.2d 591 (7th Cir.1985); *Koutsoubos v. Boeing Vertol,* 755 F.2d 352 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985); *McKay v. Rockwell International Corp.,* 704 F.2d 444 (9th Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984); *In re "Agent Orange" Product Liability*

*Litigation,* 534 F.Supp. 1046 (E.D.N.Y. 1982). This defense can provide government contractors with total immunity from suit if certain conditions are met. Courts in different circuits have defined the defense with varying degrees of strictness. *Compare Tozer v. LTV Corp.,* 792 F.2d 403 (4th Cir.1986) *with Shaw v. Grumman Aerospace Corp.,* 778 F.2d 736, 740–41 (11th Cir.1985). Our Circuit has not yet defined the defense. To employ the defense, a government contractor must prove that: (1) the government issued specifications for the item at issue or reviewed and approved a reasonably precise set of specifications; (2) the product conformed to the specifications; and (3) the government had knowledge of the product's hazards equal to or greater than the contractor. *Mannheim, supra,* 769 F.2d at 121. The third prong of the test imposes a duty on the contractor to warn the government of any dangers or patent defects not known by the government. *Koutsoubos, supra,* 755 F.2d at 355; *McKay, supra,* 704 F.2d at 451. As to the first requirement, there is no firm rule as to what constitutes "reasonably precise" specifications and what constitutes government approval. A "continuous series of negotiations" between the contractor and the government, *Mannheim,* 769 F.2d at 122, or a "continuous back-and-forth" between the contractor and the government, *Koutsoubos,* 755 F.2d at 355, may be enough. A decision by the Fourth Circuit after settlement of this case embraced the lenient standard, holding that "the defense will be permitted to a participating contractor so long as government approval of design 'consists of more than a mere rubber stamp.'" *Tozer, supra,* 792 F.2d at 408 (quoting *Mannheim,* 769 F.2d at 122).

The government contractor defense mounted by Lockheed was thus potentially formidable. The Court had denied plaintiffs' motion to strike the defense and in fact structured trial so that, at the close of plaintiffs' case, defendant would have first presented its government contractor defense and received a special jury verdict before being required to continue with the

remainder of its defense. Despite the applicability of the defense in the abstract, however, Lockheed's invocation of it was vulnerable to plaintiffs' proffer of proof of fraud. According to plaintiffs' proffer:

Lockheed is liable to plaintiffs under each of these theories for designing and building a grossly defective fleet of aircraft, the C–5A, and failing to correct the known and obvious defects. Lockheed was aware that this fleet was designed to operate at the order of the President of the United States as an instrument of national policy. Over a span of several years Lockheed consciously and. repeatedly engaged the Air Force in a business relationship in which the Air Force was defrauded. In doing so, Lockheed gained substantial profits. At a time of national need, President Ford ordered a C–5A to airlift out of Vietnam 228 orphan children, many of them the children of American servicemen. Lockheed was aware at the time that the C–5A had had numerous occurrences of door failures and that its design made a crash likely. Numerous documents exist which amply prove Lockheed's knowledge of the danger to any passenger or crew member flying in the C–5A. Lockheed failed to fulfill its contractual and citizenship obligations to the Air Force and the American people. Lockheed not only failed to alert the Air Force, it actively concealed from the government the dangers associated with continued operation of the C–5A. Lockheed's failure of its duties was motivated at all times by conscious self-interest, in conscious disregard of the rights of others.

Plaintiffs' Pretrial Brief at IV–I—IV–2. Even the recent cases applying the government contractor defense liberally have adhered to the view that a contractor must warn the government of known defects in the product. *Tozer, supra,* 792 F.2d at 408; *McKay, supra,* 704 F.2d at 451. Thus, plaintiffs' proffer of evidence of fraud, could, if proven, have defeated Lockheed's defense.

In addition, the situation presented in this case differed from a situation where the government contractor defense is clearly applicable because here the individuals killed were civilian infants, not military personnel or government employees. Thus, some of the justifications for the doctrine would not apply. The government contractor defense grows from the principles established in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), whereby the government is immune from compensating for injuries incurred by servicemen in the course of their military service. The Court in *Tozer* noted, as two rationales for its decision to apply the government contractor defense to the situation before it:

The disallowance of recovery in these actions will not leave servicemen or their survivors without relief. The Veterans' Benefits Act "provides a swift, efficient remedy for the injured serviceman." *Stencel,* 431 U.S. at 673, 97 S.Ct. at 2058. Thus one classic rationale for tort liability—that of compensation of victims—is less compelling in this context....

Forcing military mishaps into the mold of products liability litigation carries one final drawback. Pilots of the Navy and Air Force, whose service and sacrifice make possible the security of this country, are not the military doubles of civilian motorists. Their lives are led in the company of peril.

*Tozer, supra,* 792 F.2d at 407.

█ In sum, the evidence as it was proffered and as it developed during the first three days of trial indicated that plaintiff Powell had a reasonable likelihood of recovering a substantial sum from Lockheed in compensatory *and* punitive damages. Moreover, the same evidence adduced by plaintiff Powell would have been available to plaintiff Selzer. Although courts and commentators have struggled with the problem of multiple punitive damage awards against one defendant for the same wrongful act, no clear solution has developed. *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 839 (2d Cir.1967);

*Froud v. Celotex Corp.*, 107 Ill.App.3d 654, 63 Ill.Dec. 261, 264–65, 437 N.E.2d 910, 913–14 (1982), *reversed on other grounds*, 98 Ill.2d 324, 74 Ill.Dec. 629, 456 N.E.2d 131 (1983); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 459–60 (1980); J.D. Ghiardi & J.J. Kircher, *Punitive Damages*, § 5.40–5.47 (1984); Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L.Rev. 1257, 1322–25 (1976); Rheingold, *The MER/29 Story—An Instance of Successful Mass Disaster Litigation*, 56 Calif.L.Rev. 116, 136 (1968); Comment, *Mass Liability and Punitive Damages Overkill*, 30 Hastings L.J. 1797 (1979). Lockheed thus faced the clear threat of substantial compensatory and punitive damages recoveries by both plaintiffs Powell and Selzer.

In addition, although the claims on behalf of the other 74 plaintiffs for both compensatory and punitive damages had been dismissed by the December 18 Memorandum, the dismissal was not final in that plaintiffs' appeal of the dismissal was pending at the time of the settlement. Lockheed thus had no assurance that the Court of Appeals would affirm the summary judgment dismissing the 74 additional claims by putative adoptive parents. Because of the uncertain state of the appeal of the dismissal of those plaintiffs' damages claims, viewing some fraction of the $10,000,000 payment as in settlement of these claims is also reasonable. Moreover, in dismissing the 74 claims, the Court noted that there was "no presently apparent reason" why any punitive damages awarded in the *Powell* or *Selzer* cases could not be shared by the dismissed plaintiffs. December 18 Memorandum at 10. Thus, notwithstanding the dismissal of claims on behalf of the 74 additional plaintiffs, individuals whose claims were dismissed had *some* expectation of possible future compensatory and/or punitive damage awards, based upon the possibility that the Court of Appeals might reverse this Court's December 18 ruling[3] and reinstate their claim for compensatory damages, and the possibility that even if the December 18 dismissal remained intact, they would share in a *Powell/Selzer* punitive damages recovery. Accordingly, the Agreement may fairly be interpreted as offering consideration for the execution of releases by the 74 individuals who had been dismissed, but whose claims still flickered in the Court of Appeals.

Another consideration regarding Lockheed's potential liability is that until shortly before trial, Lockheed's claim over against the government remained pending. Under an agreement with Lockheed, the government agreed to pay 65 percent of any judgment against Lockheed. Agreement at § 3(1) (filed under seal August 24, 1976, unsealed April 29, 1986). However, the dismissal of Lockheed's claim over left it exposed to the risk that it might have to pay the entire amount of any possible judgment. Although Lockheed could have appealed the dismissal, or could have pursued, and may still pursue, its contract action in the Claims Court, the outcome of either of these actions was, and is, uncertain. The uncertainty was increased by the fact that the Federal Tort Claims Act, 28 U.S.C. § 2674, does not waive the government's sovereign immunity regarding punitive damage awards. Consequently, despite the contract terms, the government may not have been obligated to contribute to any punitive damage awards against Lockheed.

Lockheed's corporate liability was further uncertain because its insurance carrier may well have refused to pay any punitive damages award, depending on the terms of the contract between Lockheed and its insurer. J.D. Ghiardi & J.J. Kircher, *supra*, at § 7.10. In fact, such insurance may be against public policy. *See Hartford Life Insurance Co. v. Title Guarantee Co.*, 520 F.2d 1170, 1175 (D.C.Cir.1975); *Northwestern National Casualty Co. v. McNulty*, 307 F.2d 432 (5th Cir.1962); *Salus Corp. v.*

---

**3.** Such a reversal would not have been the first of its kind. *See Schneider v. Lockheed Aircraft Corp.*, 658 F.2d 835 (D.C.Cir.1981), *cert. denied*,

455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982).

*Continental Casualty Co.,* 478 A.2d 1067, 1070–71 (D.C.1984). In this regard, the large settlement amount reflects compromise primarily of claims that may not have been covered by insurance, even though the settlement itself may be.

Here, both parties were represented by able counsel with ten years of familiarity with the issues of the litigation. The figure they agreed upon apparently bears a significant relationship to the amount proposed by Judge Green as a settlement figure on the eve of trial when both parties had the fullest opportunity to appraise and state the essence of their claims and defenses. Moreover, these counsel and the sophisticated defendants were well able to assess the risks inherent in going to trial and to judge a fair compromise amount. A settlement "is an exercise of business judgment by the parties." *McDonald v. Chicago Milwaukee Corp.,* 565 F.2d 416, 426 (7th Cir.1977). There is no reason to believe that that judgment was clouded in this case. Certainly, defendant could have absorbed a greater settlement amount, but even a settlement which includes punitive damages must have some limit. "[T]he very essence of settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice, supra,* 688 F.2d at 624 (quoting *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977)). Moreover, defendant insisted that the Agreement which left to the court's discretion determination of the amounts to be distributed, include a reverter provision. Lockheed, when it agreed to the $10,000,000 settlement, had an expectation that it might yet recover some part of that amount. Thus given the wide range of potential outcomes of this litigation, the settlement appears to be a fair and equitable compromise of all claims on behalf of the 76 infants killed in the C–5A crash in Saigon.

### Distribution Plan

The Settlement Agreement filed April 11, 1986 contemplates that the Court will distribute the $10,000,000 proceeds of the Settlement among the claimants, FFAC itself and on behalf of the 76 deceased infants, and the plaintiffs' attorneys, with any balance to revert to defendant Lockheed Aircraft Corporation. The Agreement sets the amounts payable to plaintiffs in the *Powell* and *Selzer* cases between $525,000 and $1,000,000, fixes the share payable to Friends for All Children (FFAC) at an amount not to exceed $500,000, and leaves to the Court "absolute unreviewable discretion" with respect to distributions to any other persons including the Special Administrators, Personal Representatives and putative adoptive parents of 74 decedents and to the plaintiffs' attorneys for fees and expenses. Settlement Agreement at ¶ 7. Defendant Lockheed is precluded from appealing "any matter relating to the fund, or distribution or allowances therefrom...." Settlement Agreement at ¶ 6.

As contemplated by the Settlement Agreement, counsel for plaintiffs and counsel for defendant each submitted proposed plans for distribution of the settlement proceeds: Plaintiffs counsel proposed distribution of the entire $10,000,000 (after deduction for attorneys' fees of $3,333,333 and reimbursement of litigation expenses) among Powell, Selzer and the 74 plaintiffs whose claims had been dismissed by the Order of December 18, 1985. *See* Submissions of Plaintiffs' Counsel dated April 22, 1986 and April 28, 1986. The Settlement Agreement precluded the defendant from commenting on attorneys' fees. Lockheed's plan proposed minimal distribution to each of the plaintiffs with a large reverter to the defendant. *See* Memorandum of Defendant Lockheed dated April 22, 1986.

Plaintiffs' counsel have sent court-approved notices describing both plans and an alternative outlined by the Court, i.e., distribution of a portion of the proceeds to the plaintiffs and to some charitable organization such as the American Red Cross. Forty-five adoptive and prospective adoptive parents responded to the notice and made no objection to the fee request. Nine made no response. No claimants appeared on behalf of the sixteen children who had not been assigned adoptive parents.

The notices invited claimants to attend and participate in a hearing on August 4, 1986. Mr. Selzer and four putative adoptive parents made statements at the hearing. Plaintiffs' counsel filed a post-hearing statement based on the appealing demonstrations made at the August 4 hearing by Mr. Selzer and by putative adoptive parents. This statement reiterates that the Powell and Selzer plaintiffs should receive the full $1,000,000 authorized to them by the Settlement Agreement, and that after reimbursement of fees and expenses claimed by counsel and FFAC, the full balance of the $10,000,000 should be distributed to the putative adoptive parents.

### A.

Certain factors appear to have been critical in the negotiation of the Settlement Agreement. While those factors are not all apparent on the face of the Settlement Agreement, they must be considered and reflected in any equitable plan for distribution of the Settlement Fund.

The Settlement Fund must in part be viewed as being in satisfaction of all of plaintiffs' compensatory damage claims. But the amount of compensatory damages recoverable by both Powell and Selzer could not alone have reasonably amounted to $10,000,000. *Runyon v. District of Columbia,* 463 F.2d 1319, 1322 (D.C.Cir.1972); D.C.Code § 12–101; Colo.Rev.Stats. § 13–20–101. The claims of the 74 other plaintiffs were dismissed and, although the dismissal had not yet been affirmed on appeal, the ultimate possibility of recovery for these 74 plaintiffs was speculative at best. The December 18 Memorandum intimated, however, that these plaintiffs might share in a punitive damages recovery. December 18 Memorandum at 10. This suggestion plainly informed the negotiations which produced the Agreement.

Lockheed has by no means conceded liability for either compensatory or punitive damages, and has, indeed, vigorously de-

nied it. But the settlement involves a weighing of the risks of litigation. Without determining the merits of the case,[4] it appears that, as a practical matter, plaintiffs' punitive damages claim posed the more formidable threat to Lockheed and indeed, motivated the settlement and significantly affected its dimension. For example, plaintiffs' opening statement and early witness presentations in the *Powell* trial were, in the Court's opinion, persuasive and may well have had a strong impact on the jury. *See, e.g.,* Tr. 4/4 at 586–612 (testimony of Dr. Malcolm Newman). Most importantly, the amount of punitive damages is not yet limited by state or federal law, although the Executive Branch has recently spoken in favor of such a limit. Thus, the jury could have awarded any amount it felt appropriate to punish defendant for its conduct, *Town Center Management Corp. v. Chavez,* 373 A.2d 238 (D.C.1977); *Bolten v. Gates,* 105 Colo. 571, 100 P.2d 145 (1940), and unless unreasonable, the Court could not have disturbed it. *Miller v. Carnation Co.,* 39 Colo.App. 1, 564 P.2d 127 (1977). According to plaintiffs, "The decedent children's claims were dependent on proof of liability. In reality, in view of the difficult next-of-kin family situation of the children, their damage claims were dependent on proof of punitive liability." Joint Application of Plaintiffs' Counsel for Attorneys' Fees and Reimbursement of Expenses at 24 (filed May 14, 1986). Accordingly, because of the limit on potential compensatory damage recoveries imposed by state law and by the dismissal of the other claims, a substantial proportion of the $10 million settlement payment may be fairly attributed to plaintiffs' punitive, as opposed to compensatory, damages claims.

It must be repeated that Lockheed has not been found liable to plaintiffs for any type of damages. Nevertheless, an understanding of the nature of the claims compromised is essential to the allocation task

---

**4.** Normally, a court should not comment on the merits of a settlement. But the parties have waived any objection to such comment by sub-

mitting it for approval and requesting the court to distribute the proceeds.

contemplated by the Settlement Agreement. Under both District of Columbia and Colorado law, the two jurisdictions whose laws are potentially applicable in this litigation, punitive damages are intended to punish the defendant for willful and wanton behavior in disregard of plaintiffs' rights and to deter the particular defendant and more generally, others in defendant's position, from such future conduct. *Harris v. Wagshal*, 343 A.2d 283 (D.C.1975); *Woodard v. City Stores Co.*, 334 A.2d 189, 191 (D.C.1975); *Enright v. Groves*, 39 Colo. App. 39, 560 P.2d 851, 854 (1977); Colo. Rev.Stat. § 13–21–102. Courts and commentators have noted that punitive damages are analogous to criminal sanctions which benefit society as a whole. K.R. Redden, *Punitive Damages* § 7.0(A) (1980). Punitive damages are not intended to compensate the plaintiffs for injuries suffered. In this regard, they have been termed "a windfall" to plaintiffs. *Bass v. Chicago & N.W. Ry.*, 42 Wis. 654, 672 (1877); K.R. Redden, *supra*, at § 7.5(E); Abramson, *Punitive Damages in Aircraft Accident Cases—A Debate*, 11 Forum 50, 53 (1975); W.P. Keeton, P.B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on Torts* § 2 at 11–12 (5th ed. 1984). It has therefore been suggested that courts should exercise greater control over punitive damage awards than over other damage awards. *Roginsky supra*, 378 F.2d at 840; K.R. Redden, *supra*, at § 2.4(D); Note, *Exemplary Damages in the Law of Torts*, 70 Harv.L.Rev. 517, 530 (1957). The purposes of any punitive damages award that could have been achieved in litigation must be borne in mind in effecting distribution of this settlement which represents a compromise primarily of punitive damages claims.

Another important factor that must be considered in this distribution plan is the principle of federalism and the appropriate division of responsibility between the federal courts and state probate courts. In this litigation, FFAC, as Special Administrator and personal representative of the decedents' estates, has pursued both wrongful death and survival actions. Fourth Amended Complaint at ¶¶ 98, 99 (filed Jan. 21, 1986). The former actions contemplate recovery for those individuals who might have been expected to receive financial support from a decedent if the decedent had continued to live. D.C.Code § 16–2701; Colo.Rev.Stat. §§ 13–21–201—13–21–203. In contrast, the survival action produces a recovery for the decedents' estate, based upon the cause of action that the decedent had at time of death. D.C.Code § 12–101; Colo.Rev.Stat. § 13–20–101. The administration and distribution of assets recovered by a decedent's estate is within the special expertise of the probate courts, and involves a function that the federal courts should not usurp. *Turton v. Turton*, 644 F.2d 344 (5th Cir.1981); *Republic of Iraq v. First National City Bank*, 353 F.2d 47, 50 (2d Cir.1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). Of particular importance here, these courts have time tested procedures for furnishing notice to missing heirs and next of kin.

A final, but critical, factor to be considered in any equitable distribution plan is the relationship between the awards to be made in the decedents' cases and the awards previously made in the survivors' cases. These survivors demonstrated a critical need for funds to cope with defects and problems which they suffered and anticipated as a result of the crash. The survivors whose cases reached the trial stage settled for approximately $250,000 each, with several settling individually for approximately $1,000,000. Most of the foreign survivors realized approximately $84,000, plus access to a trust fund. The settlements of the other survivors adopted by U.S. parents averaged in excess of $100,000, plus access to a medical emergency fund. Distributions to claimants on behalf of the decedents would not be equitable if such distributions were disproportionate to the awards that have been made in settlement of the claims of living, breathing, survivors at risk for extraordinary medical and educational expenses.

The survivors gave up their punitive damages claims in exchange for what they

anticipated (not entirely accurately) would be a more expeditious recognition of their compensatory damage claims. Lockheed agreed not to contest liability, although it then turned and hotly contested causation. The survivors thus made a strategic decision based on the concern that needs of the injured infants for funds for immediate medical and educational treatment outweighed the chance for a large punitive damage award. *See Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 567 F.Supp. 790, 796 (D.D.C.1983). FFAC and the other representatives of the estates of the decedents did not relinquish the claims for punitive damages and have actively pursued them.

Plaintiffs have opposed the limits imposed by the December 18 Memorandum by arguing that it should not be "cheaper" for a defendant to kill, rather than injure, a person. *Id.* at 10. The large amount of the settlement of the decedents' cases puts this challenge to rest. At the same time, where comparing the amounts realized in settlement on behalf the survivors with the amount that should be distributed on behalf of each decedent's estate, it is apparent that, as a practical matter, the decedents' settlement compromises primarily a punitive damages claim.

### B.

■ In light of these general principles, the Court adopts the following plan for distribution of the Settlement Fund.

#### Powell

Under the terms of the Settlement Agreement, Powell is to receive between $525,000 and $1,000,000. Any amount within this range would compensate Powell for the compromise of his compensatory damages claim and award him a substantial sum allocable to settlement of his punitive damages claim. Although any amount within the contemplated range may seem high when compared to the average of $250,000 received by survivors who settled, a number of factors counsel in favor of

setting Powell's award at the upper end of the permissible spectrum.

Under the terms of the December 18 Memorandum, Powell is in the strongest position to recover. He is a natural father who was taking steps to formally adopt, had prolonged contact with Diep, provided for her support, and has actively pursued this action. He endured the trial preparation ordeal and came from Saudi Arabia to the United States to be present at the trial. The significant settlements in these cases have only occurred when one or more key cases have been poised for trial. *See* Joint Application of Plaintiffs' Counsel for Attorneys' Fees and Reimbursement of Expenses at 20–22 (filed May 14, 1986). Bringing Powell's case to trial was the key to settlement of all of the decedents' cases. In fact, Powell stood in the position to receive a substantial judgment within weeks with no obligation to share it with other plaintiffs. Although the Court could have reduced any excessive award of damages, any reasonable amount would have accrued solely to Powell, because absent this or some other settlement agreement, the Court would have had no authority to allocate the damages award among the plaintiffs. Powell's consent was required for plaintiffs' counsel to enter into the Settlement Agreement on behalf of all plaintiffs. Powell in fact signed the Settlement Agreement. Because Powell pursued his action individually and was instrumental in precipitating the settlement, his award from the Settlement Fund will be commensurate to that recovered by several individuals in the survivors' cases who settled separately, and were similarly forerunners in precipitating a global settlement of those cases. Accordingly, Powell will receive $900,000. Attorneys' fees, however, will be subtracted from his recovery as contemplated by his contract with his attorneys.

In making this award, the Court has endeavored to identify an amount which Mr. Powell could have reasonably anticipated from his compensatory damage claim, and the portion of the settlement which took into account the possibility of a verdict awarding punitive damages. The only

guideline suggested by the terms of the Settlement Agreement is the $525,000 amount to which it entitles Mr. Powell in any event. Following this clue, the Court considers no more than $525,000 (less a fee of $175,000 or a net of $350,000) to be generated by the compensatory damage claim. It is also not unreasonable to assume that the balance of any amount available for distribution by Mr. Powell and a substantial portion of the amount available for distribution on account of the 74 other deaths was generated by the punitive damage claim.

### Selzer

Under the terms of the Settlement Agreement, Selzer is also entitled to a recovery of between $525,000 and $1,000,000. Selzer is the other plaintiff whose claim was preserved under the December 18 Memorandum. For a number of reasons, Selzer's claim is not as strong as Powell's and thus his recovery should be lower. Selzer's claim involves a half-sibling relationship. Although like Powell's efforts, Selzer's pretrial efforts inured to the benefit of all participants in the Settlement Fund, his pretrial efforts were less extensive than were Powell's. At the time of the settlement, the Selzer case was not yet set for trial. Unlike Powell, who produced documents in discovery and underwent two depositions while his wife endured one, no one in the Selzer family participated in depositions or discovery. And, of course, Selzer did not have to prepare for, or attend, trial. For Selzer, at the time of the Settlement Agreement, any trial and eventual recovery were months in the future. Moreover, any punitive damages award in the *Powell* case would probably have been admissible as evidence to be considered by the jury in mitigating any additional award. *Wangen, supra,* 294 N.W.2d at 459–60; J.D. Ghiardi & J.J. Kircher, *supra,* at § 5.42. The jury, however, might have either considered it to be in mitigation of the *Selzer* punitive damage claim or proof of the validity of a large award. Finally, Selzer's signature, like Powell's, is on the Settlement Agreement and was necessary to effectuate the settlement. The relative imminence of his trial was a threat for defendant to reckon with. An award of $800,000, within the bounds established by the Settlement Agreement, reasonably compensates Selzer for his interest in the litigation and his efforts expended. Selzer also is bound by a fee contract signed by him with his counsel.

The Selzer family, like Powell, should understand that, in the Court's opinion, no more than $525,000 of the distribution to it (less a fee of $175,000 or a net of $350,000) can reasonably be attributable to settlement of the compensatory damage claim, and the balance plus a portion of that distributable to the other 74 families is accounted for by the vitality of the punitive damage claim.

### Prospective Adoptive Parents and Other Potential Participants Wrongful Death Actions

The Settlement Agreement provides that the adoptive parents may be considered as possible participants in the Fund in "the Court's sole discretion." Settlement Agreement at ¶ 4. It might be possible to differentiate between different categories of adoptive parents. The questionnaires disclosed a wide range of involvement by individual families with the decedents. One such adoptive parent, Ilse Ewald, was the FFAC in Vietnam and actually lived with her child there. At the other extreme, several families were notified of the identity of the child they were to adopt only a week or so before the crash. Most of the families appeared to have had some ongoing contact with the child destined for their home. In numerous cases due to bureaucratic difficulties, the child had been assigned to them for six months or more before arrangements were complete for the child to leave Vietnam. These families established contact by letters to the child, encouraged their other children to send letters and drawings and to think in terms of a new brother or sister, and lobbied United States and Vietnamese officials to speed up the adoption process. While all the fami-

lies appeared to welcome the opportunity to nurture one of the war's unfortunate victims, some were willing to accept special burdens, e.g., handicapped children; and some faced special losses, e.g., orphanage friends who were to be placed together were separated by death. However, the fine tuning required to accommodate this variety of conditions on the basis of the limited information available would be complex and arbitrary. Moreover, as plaintiffs argue persuasively, many prospective adoptive parents (vis-a-vis those adoptive parents who secured adoption decrees) were only prevented from consummating their adoption efforts by the unfortunate accident. Finally, it must be recognized that a substantial portion of the Settlement Fund constitutes satisfaction of claims for punitive damages.

The Court's discretion in making awards to other claimants must be informed, if not controlled, by the prospects of those claims had they been litigated to a conclusion on the various hypotheses which were viable at the time of settlement. In this process it is necessary to distinguish between wrongful death claims and survival actions. The wrongful death claim in *Powell* was dismissed. Supplemental Pretrial Order #3 (filed March 26, 1986), as the D.C. Wrongful Death statute contemplates recovery only where the injury occurred in the District of Columbia. D.C.Code § 16–2701. Colorado's Wrongful Death Statute limits damage recovery to $45,000. Colo. Rev.Stats. § 13–21–203. Moreover, it does not permit an award of punitive damages. *Mangus v. Miller*, 35 Colo.App. 335, 535 P.2d 219, 221 (1975). In the analogous situation of approval of a class action settlement distribution plan pursuant to Fed. R.Civ.P. 23(e), "care must be exercised to see that the plan is consistent with substantive rights to damages governed by state law." *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396, 1402 (E.D.N.Y.1985). Recognizing that the distribution of the Settlement Fund is intended by the parties and the Court to be non-adversarial and equitable, the Colorado statute, while not controlling, provides guidance on what claimants seeking recovery based upon wrongful death claims should ultimately realize.

Although Colorado law does not technically allow for punitive damages or compensatory damages in excess of $45,000, such claims were in fact compromised. The December 18 decision that Colorado law applies so as to bar prospective adoptive parents was not final at the time of settlement. Prospective adoptive parents on behalf of these plaintiffs thus had some remaining possibility of recovering punitive damages under D.C. law. Their claims were enhanced by the prospect that they might share in any punitive damage awards to Powell and Selzer. On the other hand, the amount of the awards for the benefit of the survivors ($84,000 plus access to a $2,500,000 trust fund for most of the foreign survivors) is a highly significant benchmark. In light of all these factors, the Court will award $101,205 *per decedent* to prospective adoptive parents.[5] Once attorneys' fees are deducted (*see* later section on Attorneys' Fees), these awards will be comparable to the $84,000 received by most of the foreign survivors. These awards are made with the understanding that the Court considers at least $39,000 of that sum to be attributable to plaintiffs' punitive damage claims.

Each participant in the Settlement Fund will execute a release on their own behalf to Lockheed, as contemplated by paragraph D.8 of the Settlement Agreement.

### Survival Actions

The Court will also award $10,000 to FFAC on behalf of each decedent's estate. It is anticipated that FFAC will (1) execute releases on behalf of the estates and (2) proceed to administer the estates in accordance with Colorado probate procedures.

---

**5.** Where prospective adoptive parents are no longer married, each will receive $50,602.50 (minus attorneys' fees). Where one family was to receive two children, that family will receive $204,410 (minus attorneys' fees).

As was discussed in the December 18 Memorandum, the Colorado Survival Statute would provide for only minimal recovery by these estates. December 18 Memorandum at 2 (citing Colo.Rev.Stats. § 13–20–101). Moreover, any *ultimate* beneficiary of the recovery by the estates (other than the State by escheat) may well have already enjoyed some recovery in satisfaction of the wrongful death claim. This procedure will preserve to the probate court its appropriate functions. *See, e.g., Turton, supra,* 644 F.2d at 347–48. The amount of $10,000 per decedent's estate may be more than would be authorized under a strict application of the Colorado Survival Statute, which does not permit an award of punitive damages. Colo.Rev.Stats. § 13–20–101. Nevertheless, like the individuals who pursued wrongful death actions on behalf of the deceased plaintiffs, FFAC, on behalf of the decedents' estates, compromised a punitive damages claim which might have been pursued had the pending appeal resulted in a reversal of the December 18 decision. Thus, some part of the portion of the Fund reflecting satisfaction of the punitive damages claim should inure to the benefit of the decedents' estates. Under the wrongful death claims there are identifiable participants in the Fund who have, to various degrees, pursued this action since its inception. Under the survival action there are no identified beneficiaries and although the Colorado probate court will presumably attempt to locate heirs and next-of-kin, the prospect of locating any beneficiary at this late date and after the efforts already made, are bleak. The $10,000 sum awarded reflects the lesser likelihood of ultimate recovery by a beneficiary under the survival, as opposed to wrongful death, action. On the other hand, it is important to protect the settlement from collateral attack by affording any presently undiscovered heirs and next-of-kin all of the notice afforded by a state's probate system. A substantial award to each decedent's estate and administration of the resulting corpus in the Colorado probate system should accomplish these objectives.

### *Awards to "Other Claimants"*

The Notice sent to potential claimants on May 23, 1986, stated that the Court would consider a distribution plan which awarded "a lump sum ... to FFAC or some other charitable organization (e.g., American Red Cross) performing a role similar to that performed by FFAC in the 1960's and 1970's." On June 3, 1986, Thomas A. Troyer of Caplin & Drysdale, Chartered, was appointed as *amicus curiae* to advise on the participation of charitable organizations in the Settlement Fund. As part of his services as *amicus,* Mr. Troyer evaluated those proposals submitted by organizations which might be appropriate recipients of some or all of the punitive damage element of the settlement, i.e., the American Red Cross, the Margaret Moses Memorial Foundation or the Edna McConnell Clark Foundation. He recommended that the Court make a distribution to the Clark Foundation primarily because of its commitment to use any funds distributed to it to assist children who have emigrated to the United States from Southeast Asia, and because it is an established organization which could apply the funds without having to bear heavy start-up and administration expenses.

The proposals submitted by Mr. Troyer and by the charitable organizations have been given very careful consideration. Because a substantial portion of the Settlement Fund was generated by plaintiffs' punitive damage claims, an award to a "non-party" to benefit those whose situation is similar to that which the decedent orphans would have had if they had lived would be particularly appropriate. Punitive damages are not compensatory and they therefore provide a windfall to parties who receive them. In the words of one court,

> it is ... difficult to understand why if the tortfeasor is to be punished by exemplary damages, they should go to the compensated sufferer, and not to the public in whose behalf he is punished.

*Bass, supra,* 42 Wis. at 672. Moreover, a substantial award of punitive damages to

these claimants would appear inequitable in light of the relatively modest awards received by survivors of the crash who felt compelled by their circumstances to forego an opportunity for punitive damages in order to speed up relief.

At the same time, punitive damages serve the necessary and important function of punishing a defendant for conduct injurious to others and to the public and deterring that defendant and others from such behavior in the future. Such damages may be particularly appropriate when the amount of money sufficient to compensate living relatives does not appear to be an adequate measure of the total loss to society. In this case, for example, where the deceased children were orphans, punitive damages may be necessary to ensure that their deaths were not "free". When plaintiffs agreed to settle this case, they gave up their right to pursue further and obtain such punishment and deterrence of Lockheed by formal verdict and judgment. They may well have contemplated that some of their purpose was achieved through the amount and terms of the Settlement Agreement. To allow the bulk of the fund created in settlement to revert to defendant might deprive plaintiffs of the benefit of their bargain, not only financially, but in terms of the public purpose served by their sometimes painful pursuits of punitive damages. To allow a substantial portion of punitive damages settlement to revert to the alleged wrongdoer because of the perceived inequity of distributing large amounts to the particular plaintiffs would be ironic and unfair and contrary to the higher purposes of plaintiffs.

An award to charity from the punitive damage element of the Settlement Fund would therefore serve the important function of deterrence and would help compensate society for the loss of these children. Before making such an award, however, the Court must determine whether it has the authority, under the Settlement Agreement or general principles of tort recovery, to distribute the funds to non-parties.

By the terms of the Settlement Agreement, the Court has "absolute unreviewable discretion," to determine how the Settlement Fund will be distributed. In addition, the Agreement seems to contemplate that the Court will made awards to "persons" other than "blood relatives, adoptive parents, identified prospective adoptive parents and siblings by blood or adoption." [6] Apart from this contractual authorization, recent cases have established that a court need not adhere to traditional principles of individual tort recovery where the result would be unjust, inequitable, or impossible to determine. *Agent Orange, supra,* 611 F.Supp. at 1402; *In re Equity Funding Corp. of America Securities Litigation,* 603 F.2d 1353, 1365 (9th Cir.1979). In these circumstances, analogy to the *cy pres* doctrine of testamentary interpretation is in order. *Agent Orange, supra,* 611 F.Supp. at 1403. As originally formulated, the *cy pres* doctrine is a rule of construction used by courts to effectuate testimentary charitable gifts that would otherwise fail. When applying *cy pres,* the court attempts to conform as closely as possible with the intent of the testators. The court may also consider the degree to which a possible plan would be of public service. More recently, courts have applied *cy pres* principles when distribution plans arise in large class actions. For example, where it is impossible to reach only those injured and where proposed remedies will benefit those who are not members of the plaintiff class, the court will attempt to ascertain which alternative recipients are preferable. And "[a]s it becomes more difficult, or even impossible, to ascertain which alternative recipients the legislature would prefer, it may be appropriate to devote the funds to a broader public service in order to maximize the benefit to society." Note, *Damage Distribution in Class Actions: The*

---

**6.** Paragraph 7 of the Settlement Agreement gives the Court "absolute unreviewable discretion to determine the identity of the persons (including by not limited to blood relatives, adoptive parents, identified prospective adoptive parents and siblings by blood or adoption) and the amounts to be disbursed to such persons ..."

*Cy Pres Remedy,* 39 U.Chi.L.Rev. 448, 452–53 (1972).

The *cy pres* doctrine suggests that funds generated by a settlement of civil litigation may properly be distributed to beneficiaries who are not parties to the law suit if such a distribution effectuates the settlement. Indeed, the Supreme Court has recently affirmed a District Court remedy which relied on a similar principle of equity. In *Local 28 of the Sheet Metal Workers v. E.E.O.C.,* — U.S. —, 106 S.Ct. 3019, 3033, 92 L.Ed.2d 344 (1986), the trial judge used the proceeds of a contempt fine levied against the union defendant in a Title VII case to create a fund to aid minority prospective union members. The Supreme Court approved this remedy despite the fact that it benefited non-parties who were not directly harmed by the defendant.

Although punitive damages have not traditionally been recognized in equity, there appears to be no compelling reason not to apply this *cy pres* doctrine to effect a just distribution of a fund representing settlement primarily of punitive damages claims. Nonetheless, the matter is not free from doubt. Certain sections of the Settlement Agreement do appear to suggest that only those with legal claims against Lockheed should participate in the Fund.[7] And there remains some question about whether the *cy pres* rationale is appropriate when a settlement agreement contains an explicit reverter provision.[8] Moreover, at and after the August 4 hearing, Lockheed challenged the Court's authority to distribute funds to a non-party, and argued that any portion not distributed to a plaintiff should revert to Lockheed. In addition, one of the guiding lights of FFAC and of the Moses Foundation has filed a strong objection to the amicus' proposal of a distribution to the Clark Foundation. These recent develop-

ments ominously portend that to distribute a portion of the punitive damage settlement to these institutions instead of to the named plaintiffs could defeat one of the main purposes of the Settlement Agreement: to end this unpleasant controversy.

It obviously does not follow that the portion of the fund which might have been generated by the punitive damage claims should revert to Lockheed. Quite the contrary. Punitive damages were claimed, remained at issue, and would have been awarded if plaintiffs had proved their proffer, not to compensate any plaintiff, but to vindicate a public interest. Accordingly, there will be distributions to Powell and Selzer of amounts approaching the limit authorized by the Settlement Agreement and to the 74 families of amounts consistent with that realized by and for the benefit of the survivors who did not prepare for trial.

There remains the possibility that the plaintiffs, led by Messrs. Powell and Selzer and their attorneys, will voluntarily share the proceeds traceable to punitive (as distinguished from compensation) damage claims with one or more of the institutions identified by Mr. Troyer or with the two trusts created for the surviving children (i.e., the Vietnam Childrens' Medical and Educational Trust—Foreign, and the Vietnam Childrens' Medical and Educational Trust—Domestic). If this desirable result occurs, then the commendable efforts of Mr. Troyer and the institutions which submitted proposals will not have been in vain, but rather will have served as the necessary predicate to the ultimate distribution of a substantial portion of these funds for a public purpose.

The Court urges counsel, and particularly Mr. Selzer, to undertake that task, per-

---

7. For example, paragraph 8 of the Agreement provides that "any persons who receive any award from the Fund" shall deliver to Lockheed a release of claims. This provision suggests that the parties intended the funds to be distributed to those with claims against Lockheed.

8. In *Agent Orange,* for example, the Court stated that "[s]ince the settlement agreement does not

provide for automatic reversion of any portion of the settlement fund except on disapproval of the settlement, there is no basis for objecting to the mode of fund allocation among the plaintiffs on the ground that the Court lacks *cy pres* authority." 611 F.Supp. 1396, 1403 (D.C.N.Y. 1985).

haps in concert with Mr. Troyer. As Mr. Selzer so eloquently testified at the August 4 hearing, those who offered to adopt strange, and in some cases unhealthy and handicapped infants must have been inspired by the noblest of motives. These individuals are now in a position to carry out their objectives in what could be a most satisfying and useful way. Each is urged to read the submissions by Mr. Troyer thoughtfully and in the spirit which prompted them to seek to adopt a child ten years ago. Accordingly, as part of the distribution plan, counsel will be directed to send to each individual distributee a copy of this memorandum, with a note directing attention to the section on "Awards to 'Other Claimants'." together with copies of the text (but not the appendices) of the submissions by the Red Cross, the Moses Foundation and the Clark Foundation.

### Reverter

As explained in more detail above, it would not serve the purposes of the Settlement Agreement to allow a large part of the fund to revert to Lockheed. Nonetheless, a number of people who were entitled under the Settlement Fund to submit claims to the Court have not responded. The reverter provision in the Settlement Agreement leaves no principled alternative to a plan which requires return to defendant of what are, in effect, the unclaimed shares of persons who, for whatever reasons, did not participate in the distribution. Defendant Lockheed is therefore entitled to any balance remaining in the Registry of the Court after April 10, 1987.

### Attorneys' Fees and Expenses

The Settlement Agreement contemplates that the Court will exercise its discretion to fix attorneys' fees. Plaintiffs' counsel have contracts for a fee equal to one-third of any recovery, plus expenses. On this basis, they claim a fee of $3,333,333.00. They supplement their application with detailed schedules showing that they have logged 11,394 hours and have, in their regular practice, established rates ranging up to $225.00 per hour. They show that applying their established rates to their time, yields a "lodestar" charge of $1,507,165.00.

Attorneys generally may compute contingent fees on the basis of the entire recovery which their efforts produced. *See generally* S. Speiser, *Attorneys' Fees* § 2:14 (1973). However, plaintiffs' attorneys do not have binding contingent fee contracts with all of the persons receiving disbursements. Furthermore, where a court has responsibility for a settlement fund, it may and should review a contingent fee arrangement and modify it in terms of the equities of the case. *See Rosquist v. Soo Line Railroad,* 692 F.2d 1107, 1111 (7th Cir.1982); *Hoffert v. General Motors Corp.,* 656 F.2d 161, 165 (5th Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982); *Allen v. United States,* 606 F.2d 432, 435 (4th Cir.1979); *Cappel v. Adams,* 434 F.2d 1278, 1280 (5th Cir.1970).

Court supervision is particularly appropriate where, as in this case, the fee contracts are not enforceable with respect to the awards to all of the claimants. In determining a reasonable fee where a contract does not govern, the court will consider an appropriate percentage figure, the "lodestar" submitted by plaintiffs attorneys and the need to compensate these attorneys for the risk which they assumed that their clients might recover little or nothing. Finally, it is important to reward efforts such as those expended by counsel here without permitting offensive overpayment of lawyers. In this case, the fact is that the size of this settlement reflects the skill and persistence of the plaintiffs lawyers in the prosecution of the punitive damage claim. But it is also a fact that no special bonus for skill and persistence should be expected of counsel who command hourly rates ranging up to $225 per hour. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* —— U.S. ——, 106 S.Ct. 3088, 3098–3100, 92 L.Ed.2d 439 (1986).

While it would have been much simpler administratively to award a percentage fee

measured by the entire proceeds of the settlement, or a simple adjustment of the lodestar, the circumstances require that the Court apply factors derived from both the fee agreements and from the lodestar adjustment process. In proceeding in this fashion with respect to fees, the Court has carefully considered the contention advanced by plaintiffs' attorneys that fee contracts apply to the entire $10,000,000 settlement, including any amount which may not be distributed and, instead, may revert to defendant. They cite *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), in which attorneys' fees were assessed on the entire settlement fund, even though some reverted to the defendant. Under the rationale of that case, plaintiffs' attorneys received fees measured by all awards that were vested at the time of the fund's creation. There, "each member of a certified class ha[d] an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Id.* at 479, 100 S.Ct. at 749. A similar analysis will apply here to some elements of the Settlement Fund. It is important to note, however, that some of the participants (i.e. the several putative adoptive parents) in the Fund did not have vested claims at the time of the settlement.

Messrs. Powell and Selzer negotiated with plaintiffs' counsel and entered into agreements which provided for a one-third contingency fee. Both men are adults. Mr. Powell is a businessman; Mr. Selzer is an experienced attorney. Their level of experience suggests that they should be bound by their contracts. *See Taylor v. Bemiss*, 110 U.S. 42, 3 S.Ct. 441, 28 L.Ed. 64 (1884). Furthermore, a one third contingency fee is not unreasonable where the attorneys expended considerable effort preparing the cases for trial and the settlement won for their clients a vested right to a substantial award. Therefore, plaintiffs' attorneys will receive $300,000 of the $900,-000 awarded to Mr. Powell and $266,666 of the $800,000 awarded to Mr. Selzer.

The fee claim for services to the putative adoptive parents resembles that for services to Powell and Selzer in some respects and differs in other respects. There is a fee contract. But it is with Charles Work in his role as guardian *ad litem* of the interests of any infant beneficiary of the estate. of a deceased child. Work, as guardian, could not bind the adoptive parents. On the other hand, all of the putative adoptive parents received actual notice of the 33⅓ percent fee claim as part of the notice they received about the settlement. None objected to the fee. Nevertheless, a full 33⅓ percent contingency fee is not appropriate when the attorneys represent a large number of plaintiffs with similar or identical claims. In such a situation, work done on behalf of one client benefits many others; such economics of scale should be shared by attorneys with their clients. In *Donnarumma v. Barracuda Tanker Corp.*, 79 F.R.D. 455 (C.D.Calif.1978), for example, the Court declined to enforce an explicit contingency fee contract in a case arising out of an explosion on a ship. The Court relied, in part, on the fact that plaintiffs' attorneys represented twenty three claimants and found that "the overwhelming majority of the work done for each of the numerous plaintiffs in this case was work done for all." *Id.* at 464. Similarly, in this case, the work done by counsel on behalf of the putative adoptive parents and their anticipated adoptees, particularly the complex motions and appellate litigation over representation and standing, served all of them at once. In fact, all of these claimants were represented *en masse* by FFAC which was the sole plaintiff.

Plaintiffs' counsel have themselves acknowledged, in a previous fee application, that a 33⅓ percent contingency fee might not be appropriate in air crash suits involving wrongful death claims. *See* Supplemental Submission by Plaintiffs' Counsel with Respect to their Request for Fee Award at 6 (filed October 25, 1982). In their earlier application, plaintiffs' counsel distinguished such a situation from the litigation in the survivors' cases where "each infant's entire medical history was exhaustively examined and reexamined, the causa-

tion and extent of each plaintiff's injuries was contested longer and more vigorously than in any case known" to plaintiffs' attorney. *Id.* In its opinion of June 13, 1983, the Court agreed that the "economies of scale" principle was not applicable to the survivors' litigation. *See Friends For All Children, Inc. v. Lockheed Aircraft Corp.,* 567 F.Supp. 790, 808 (D.D.C.1983). It does appear, however, to fit the facts of the decedents' litigation and counsel for plaintiffs have suggested no reason why it should not apply.

The awards granted to the adoptive parents will therefore not be subjected to a 33⅓ percent charge for attorneys' fees. Nonetheless, plaintiffs' attorneys did create the Settlement Fund and the opportunity for the adoptive parents to apply to participate in the distribution. The Court therefore finds that plaintiffs' counsel should receive a fee award of 17% of the recovery being distributed to the putative adoptive parents and to the decedents' estates (or approximately half the amount claimed). The $101,205 fee awards on behalf of each wrongful death claim shall be subject to a fee award of $17,205. The $10,000 awards on behalf of the survivors' actions of the decedents should be subject to attorneys' fees of $1,700.

The total fees awarded under this percentage method equal $1,518,306. Since this distribution is being guided by equitable considerations, the principles developed for ascertaining a reasonable amount of attorneys' fees should also be consulted. It is instructive to compare the fee award which was calculated on a percentage basis with the "lodestar" submitted by plaintiffs' attorneys.

The now familiar "lodestar" approach requires a court to make an initial estimate of the proper fee by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 12–13 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). Under this approach, it is necessary to examine the hours claimed closely to determine that none were unnecessary or repetitive. Faced with earlier fee and expense applications in this complex case, the Court has employed Special Masters who generously devoted many hours of their time to scrutinizing the attorneys' claims. Final Report of the Special Master (filed under seal, December 31, 1985); Final Report of the Special Master (exhibits filed under seal, May 3, 1983) (expenses only). The Court has also held adversary hearings to determine the reasonableness of these fee applications. *See Friends For All Children, Inc. v. Lockheed Aircraft Corp.,* 567 F.Supp. 790 (D.D.C.1983). The result of these detailed inquiries was that almost all of the attorneys' time figures and hourly rates were approved as reasonable.

In light of these careful tests, it does not appear to be necessary to engage in a similarly detailed inquiry regarding this final application. Plaintiffs' counsel submitted a memorandum and affidavits documenting $1,507,165 in attorneys' fees and $780,541 in expenses. This fee amount is the product of 11,394 hours chargeable at very generous hourly rates ranging from $200 to $225 for lead counsel. Counsels' hourly time claims appear facially reasonable. In addition, the hourly rates are documented by affidavits which list the names of clients who regularly pay these charges under non-contingent fee arrangements.[9]

---

9. An affidavit of J. Vernon Patrick (filed May 10, 1986) asserts that he has regularly been paid $225 per hour by such clients as Touche, Ross & Company; Firstgulf Bancorp; First Virginia Banks, Inc.; Charter Federal Savings & Loan; and several others. An affidavit of Jacob A. Stein (filed May 13, 1986) lists the following clients who have paid the hourly billings rates assigned to the attorneys from his firm: The Lerner Corporation, Unity Buying Service Inc., Echlin Inc., Horizon Corp., and Mid-Atlantic International Imports Inc. William M. Cohen has submitted a similar affidavit (filed May 2, 1986) listing the following clients: I.B.M., Charles E. DuPont, Jr., Marigot Corporation, Feldman & Simpson Investments and several others. The affidavits of Mr. Stein and Mr.

This lodestar figure is substantial evidence of a reasonable fee for the services performed.

It is instructive to compare this lodestar figure, $1,507,165 with the contingent fee figure derived above of $1,518,306. Had the Court awarded a full 33⅓ percent of the Settlement Fund, the two amounts would be grossly disproportionate. The fact that these two figures are so close suggests that this amount is a reasonable and equitable base figure for this attorneys' fee award. However, the *Copeland* Court provided that the "lodestar" could be adjusted on the basis of several factors, including the risk that the litigation would not result in an award for the plaintiffs. *See Copeland v. Marshall*, 641 F.2d 880, 892 (D.C.Cir.1980). In view of the substantial uncertainty surrounding the successful litigation of these wrongful death claims, it is appropriate to award the plaintiffs' attorneys an additional sum as a "contingency adjustment."

It should be noted that plaintiffs' attorneys faced substantial risks not because they were advancing meritless claims but because the litigation involved several novel legal issues (e.g., choice of law, FFAC representation and the government contractor's defense). Furthermore, the risk involved was increased by the fact that the resolution of these matters required thousands of hours of work over the course of a decade and by the ability of defendants to postpone and protract litigations and thereby exhaust plaintiffs and their resources. Assuming a task of this magnitude on a contingent fee basis must have placed considerable strain on the financial resources of the plaintiffs' attorneys. In light of these risks, a contingency bonus is appropriate.

It might be argued that recent cases in this circuit preclude the consideration of risk in the assessment of attorneys' fees. In *Laffey, supra,* for example, the D.C. Circuit held that a contingency enhancement should be awarded only in the "exceptional case." 746 F.2d at 28; *see also*

*Sierra Club v. E.P.A.*, 769 F.2d 796, 809 (D.C.Cir.1985). *Laffey* does not control here. First, the history of this litigation demonstrates that it is exceptional. Moreover, in *Laffey*, successful plaintiffs in a Title VII action sought an assessment of attorneys' fees against the defendant airline pursuant to a federal statute which required the court to compute a reasonable fee. Here, by contrast, the Court is merely using the "lodestar" analysis as a means of checking on the reasonableness of a contingency award imposed on the proceeds of a settlement fund. More importantly, the rationale of *Laffey* does not apply here. The *Laffey* Court noted that increasing a Title VII fee award against the defendant when the litigation was especially risky would "creat[e] a perverse penalty for those least culpable." *Id.* at 26. In this case, since the fees will be subtracted from a settlement fund created for the plaintiffs' benefit, the contingency adjustment creates beneficial rather than "perverse" incentives by alerting plaintiffs, in risky cases, to the substantial costs of litigation. Counsel have also reminded the Court that while they received over $11,000,000 in fees in the survivors' cases, the hours logged in those cases produced a lodestar substantially in excess of the fee awarded to them. For these reasons, a special contingency adjustment of $300,000 will be added to the award figure of $1,518,306 and will be assessed against the fund.

*Litigation Expenses*

Plaintiffs' attorneys have also requested $780,541 in expenses. These expenses have been reviewed by Keller, Zanger & Co., certified public accountants, and are facially reasonable. Friends For All Children, Inc. Accounting For Expenses of Litigation Exclusive of Attorney Fees (filed May 14, 1986). This conclusion is reinforced by the fact that a previous expense application reviewed by these same accountants received almost complete approval by the Special Masters after 680 hours of vigorous scrutiny. *See Friends For All*

Cohen, however, fail to specify which attorneys' rates were paid by which clients.

*Children, Inc. v. Lockheed,* 567 F.Supp. at 802 n. 16. These expenses will be charged against the Fund as a whole rather than subtracting a pro rata share from the awards to each recipient. This method has been chosen because it helps simplify the calculations. Since the award of expenses against the settlement as a whole decreases the funds available to the claimants, a pro rata share of the expenses is implicit in each award. Moreover, this method of allocating expenses appears to be contemplated by the Settlement Agreement which states that "the Court shall make such allowances [from the Settlement Fund] for attorneys' fees, litigation fees and expenses, costs ... as the Court deems appropriate...." and "[t]he entire Fund ... shall be subject to allowances for attorneys' fees, litigation fees, and expenses ... and costs...." Settlement Agreement at ¶ 5.[10]

One item of expense, however, is a 2% contingency award to Dr. Michael Cohen for his services. By contract, Dr. Cohen is to receive $6,500 per month plus 2% of any judgment or settlement. The only signatory to the contract is Charles R. Work, who signed on behalf of infant beneficiaries of the decedents' estates. He could not bind FFAC or the potential adoptive parents.

Dr. Cohen's affidavit states that the contract was approved by the Court. But it was not. Neither the Court nor the Special Master approved it. Instead, after review by the Special Master, the Court approved a cover letter to the parents of the *surviving* children. Order (filed February 17, 1984 in Civil Action No. 76–0544).

Dr. Cohen's hours claims are not even facially reasonable. Dr. Cohen was hired to assist plaintiffs on matters requiring medical and technical expertise. A recurring problem in this litigation has been that plaintiffs' counsel have used Dr. Cohen to perform tasks which would normally be included in a law firm's overhead. *Friends*

*For All Children, Inc. v. Lockheed,* 567 F.Supp. at 815. Here, the same problem resurfaces. As an example, in the single month of February of 1986, Dr. Cohen billed 348 hours for preparation of plaintiffs' list of exhibits. These tasks could have been cost-efficiently delegated to support staff who are available for substantially less than $6,500 per month plus a 2% contingency. In order to establish a reasonable lodestar, attorneys should have demonstrated that they have exercised billing judgment in reducing redundant or non-cost-efficient hours. Dr. Cohen's time sheets do not indicate that sufficient billing judgment was exercised, either by him or by the individuals who hired him.

There is also no reason why Dr. Cohen should recover his full 2% under his contract when it would be inequitable for plaintiffs' attorneys themselves to recover their contractual contingency on the entire Settlement Fund. It is impossible from Dr. Cohen's time sheets to separate what hours were devoted to tasks which required his special expertise and which tasks should have been more efficiently delegated. An equitable solution is allowance of a fee to Dr. Cohen of approximately the same percentage that plaintiffs' attorneys received. Plaintiffs' attorneys requested $3,333,333 and received $1,818,306 or approximately 55%. The same percentage applied to Dr. Cohen's fee results in an award of $143,687.50. Plaintiffs' attorneys' requested expense award will thus be reduced by $117,562.50 from $780,540.90 to $662,978.40.

The guardians *ad litem* have claimed the relatively modest amount of $76,806.76 in fees and expenses including $21,479.65 for the fees and expenses of Peabody, Lambert & Meyers, the firm which preceeded the guardians' current firm. These amounts are facially reasonable and are therefore approved. The guardians are also entitled to a bonus for risk at the same percentage as the attorneys' bonus (20%). They will

---

10. The Settlement Agreement also provides that the awards to Messrs. Powell and Selzer shall be "not more than one million dollars ($1,000,000) (subject to fees, costs and expenses)." However, neither claimant is receiving an award which would exceed $1,000,000 if it included his pro rata share of the expenses so this provision of the Settlement Agreement is not violated by subtracting the expenses from the entire fund.

therefore receive an additional sum of $15,-361.35.

In view of the foregoing, the following plan of distribution is adopted:

### DISTRIBUTION PLAN

| Payee | Gross Amount | Attorneys' Fees | Rate | Net Amount |
|---|---|---|---|---|
| Powell | $ 900,000 | $ 300,000 | 33.33% | $ 600,000 |
| Selzer | $ 800,000 | $ 266,666 | 33.33% | $ 533,334 |
| 45 families of decedents ($101,205 × 48) | $4,857,840 | $ 825,840 | 17% | $4,032,000 |
| FFAC (Survival Action) | $ 740,000 | $ 125,800 | 17% | $ 614,200 |
| Attorneys (Bonus) | $ 300,000 | $ 300,000 | | |
| TOTAL | $7,597,840 | $1,818,306 | | $5,779,534 |

### · EXPENSES

| | | |
|---|---|---|
| Attorneys | $ 519,290.90 | (Exclusive of Dr. Cohen's Fee) |
| Dr. Cohen | $ 143,687.50 | (55% of $261,250) |
| Guardians Ad Litem | $ 76,806.76 | (fees = $53,291.25) (expenses = $ 2,035.86) (Peabody = $21,479.65) |
| Guardians Ad Litem (Bonus) | $ 15,361.35 | (20% of 76,806.76) |
| FFAC | $ 500,000 | |
| TOTAL | $1,255,146.51 | |

| TOTALS | | |
|---|---|---|
| | Distributions | $5,779,534 |
| | Fees | $1,818,306 |
| | Expenses | $1,255,146.51 |
| | | $8,852,986.51 |

Fees and Expenses (including distribution to FFAC) = 35% of Total Distribution.

---

The Settlement Agreement contemplates that the balance, which will be subject to any reasonable costs incurred in implementing this distribution plan, remain in the Registry of this Court until April 10, 1987, at which time any then remaining will revert to Lockheed.

It is requested that counsel prepare, by August 29, 1986, if possible, a proposed order modeled after earlier distribution orders which would implement this plan, and, in addition, provide for the furnishing to defendant of the releases contemplated in the Settlement Agreement.

## ON MOTION FOR RECONSIDERATION

The motion for reconsideration filed by plaintiffs' counsel requires a brief comment and two adjustments to the distribution plan.

By way of comment: the motion for reconsideration apparently presumes that the reverter to Lockheed represents unclaimed awards on behalf of the 16 children who had no putative adoptive parents at the time of the crash. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Reconsideration and Modification of this Court's Memorandum filed August 22, 1986 at 19. The August 22 Memorandum may not have been as clear as it could have been on this point: the part of the settlement fund which will revert to Lockheed is roughly the portion allocable to nine families who were specifically granted the right to be considered in the distribution of the fund, but who, after notice, failed to pursue any claim. The Settlement Agreement, including the reverter provision, is most fairly interpreted as assuming that such shares available to those nine who did not pursue claims would revert to Lockheed.

Excluding the portion attributable to the nine prospective adoptive parents who did not pursue claims, the entire fund has been distributed to available claimants. Plaintiffs' attorneys have now suggested, apparently for the first time,[1] that the Court should make an award to FFAC on behalf of the 16 children who had not been placed with adoptive parents. Under the Memorandum of August 22, FFAC is to receive $500,000 in lieu of administrative expenses authorized by the Settlement Agreement. Moreover, the Memorandum of August 22 explicitly anticipates that FFAC, or the Margaret Moses Memorial Foundation, may receive additional funds from the claimants who received awards of both compensatory and punitive damages. Hopefully, disappointment about the decision to honor the reverter provision of the Settlement Agreement will not distract awardees from sharing with these or other institutions, such as the Red Cross or the Clark Foundation.

By way of further comment and adjustment: the motion for reconsideration takes exception to the failure of the August 22 Memorandum to address the discrepancy between the addition to lodestar reflected in the fee approved for Williams and Connolly in the foreign survivors' cases and that applied to the fee award in the decedents' cases. There are, of course, many similarities and many differences between the two situations. One difference is that Williams and Connolly participated in only one phase of this three phase litigation and did so when the incumbent counsel withdrew from responsibility while retaining a right to share in any final fee. Counsel in the decedents' cases have pariticipated in all

three phases and have enjoyed a well-compensated business and professional opportunity for several years. Nevertheless, the August 22 Memorandum did not give appropriate weight to the relationship between the Williams and Connolly award and their "lodestar." To give proper recognition to that precedent, the plan of distribution is revised to make the total fee award $2,018,306, or 20% of $10,000,000. With this award, as it will be adjusted, their net compensation from the three phases, after reimbursement for all expenses, will be $9,484,998.37 or 20% of the $47,398,159.90 which has been yielded by their efforts.[2] Plaintiffs' motion for reconsideration argues with great vigor that the award contemplated will chill the interest of able lawyers in representing plaintiffs in cases like this one. Plaintiffs' Motion for Reconsideration filed August 29, 1986 at 11–12. Only time will tell, but it is the judgment of the Court that this is not a likely prospect.

This adjustment requires a corresponding adjustment of Dr. Cohen's compensation to $156,750. As a result he will have received in the neighborhood of $1,000,000 for his unique and valuable contribution in all three phases.

A revised distribution plan is attached.

In view of the foregoing, there is no occasion for the further hearing requested by Mr. Selzer and others. Counsel should put in final form the attached revision to their proposed order, attaching thereto the worksheets used by counsel to calculate interest, and file it with the Clerk on, or as soon after, September 11, 1986 as possible.

---

**1.** None of the three submissions by plaintiffs' counsel regarding the distribution of the Settlement Fund suggested that FFAC should receive an award on behalf of the 16 "unplaced" children. *See* First Submission of Plaintiffs' Counsel filed April 22, 1986; Second Written Submission of Plaintiffs' Counsel filed April 28, 1986; Plaintiffs' Supplemental Filing in Support of Plaintiffs' Request that All Available Funds Be Distributed to the Adoptive Parents and For Surviving Family Members filed August 8, 1986. All of these submissions take the position that

the Court should effect an equal distribution of all the remaining funds to the adoptive parents after deduction of fees, costs, expenses and distributions to blood relatives. First Submission of Plaintiffs' Counsel at 6–7; *see also* Second Written Submission of Plaintiffs' Counsel at 6 (reaffirming that position).

**2.** This figure does not include the $2,595,000 awarded to Williams and Connolly for their services in the foreign survivors' cases.

## APPENDIX

### REVISED DISTRIBUTION PLAN

| Payee | Gross Amount | Attorneys' Fees | Rate | Net Amount |
|---|---|---|---|---|
| Powell | $ 900,000 | $ 300,000 | 33.33% | $ 600,000 |
| Selzer | $ 800,000 | $ 266,666 | 33.33% | $ 533,334 |
| 45 families of decedents (101,205 × 48) | $4,857,840 | $ 825,840 | 17% | $4,032,000 |
| FFAC (Survival Action) | $ 740,000 | $ 125,800 | 17% | $ 614,200 |
| Attorneys (Bonus) | $ 500,000 | $ 500,000 | | |
| TOTAL | $7,797,840 | $2,018,306 | | $5,779,534 |

### EXPENSES

| | | |
|---|---|---|
| Attorneys | $ 519,290.90 | (Exclusive of Dr. Cohen's Fee) |
| Dr. Cohen | $ 156,750. | (60% of $261,250) |
| Guardians Ad Litem | $ 76,806.76 | (fees = $53,291.25) |
| | | (expenses = $ 2,035.86) |
| | | (Peabody = $21,479.65) |
| Guardians Ad Litem (Bonus) | $ 15,361.35 | (20% of 76,806.76) |
| FFAC | $ 500,000 | |
| TOTAL | $1,268,209.01 | |

| TOTALS | | |
|---|---|---|
| | Distributions | $5,779,534 |
| | Fees | $2,018,306 |
| | Expenses | $1,268,209.01 |
| | | $9,066,049.01 |

Fees and Expenses (including distribution to FFAC) = 36% of Total Distribution (excluding Reverter to Lockheed).